Sharon W. Ng (SBN AZ 024975)
Michael Vincent (SBN AZ 029864)
STINSON LLP (Firm ID 00462400)
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004
Telephone: 602.279.1600
Facsimile: 602.240.6925
sharon.ng@stinson.com
michael.vincent@stinson.com

Christopher A. Pickett (*Pro Hac Vice* pending)
GREENSFELDER, HEMKER & GALE, P.C.
10 South Broadway, Suite 2000
St. Louis, Missouri 63102
Telephone: 314.516-2689
Facsimile: 314.241.4245
cap@greensfelder.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| BMO Harris Bank N.A., d/b/a BMO Private Bank,<br><br>Plaintiff,<br><br>v.<br><br>Duncan Corley, an individual; Jason Miller, an individual; Louise Goudy Willmering, an individual; and Kris Yamano, an individual,<br><br>Defendants. | Case No. _____<br><br>COMPLAINT FOR INJUNCTIVE RELIEF |

Plaintiff BMO Harris Bank N.A. d/b/a BMO Private Bank ("BMO") by and through its undersigned counsel, and for its Complaint against Defendants Duncan Corley, Louise Goudy Willmering, Jason Miller, and Kris Yamano (collectively "Defendants"), states as follows:

**STATEMENT OF THE CASE**

1.  This action seeks damages and a preliminary injunction to maintain the status quo pending resolution of this matter between BMO and Defendants.

2. This dispute arises from Defendants' breach of their respective employment agreements wherein each Defendant agreed not to solicit BMO clients and not to take BMO Confidential Information.

3. This dispute also arises from Defendants' breach of the fiduciary duties each owed to BMO during the course of their employment.

4. In July 2021, Defendants conspired together and on the exact same day purposefully gave notice to BMO that they intended to resign and begin working at Crewe Advisors, Inc. ("Crewe").

5. Indeed, on July 6, 2021, each Defendant abruptly tendered identical notices of resignation in a coordinated fashion.

6. Defendants then began working for Crewe on September 4, 2021.

7. Following their resignations, BMO sent multiple reminder letters to Defendants reiterating their employment obligations not to solicit and not to improperly retain confidential client information.

8. Defendants, with the help of Crewe, ignored their post-employment obligations and improperly solicited BMO clients and used BMO Confidential Information to BMO's detriment.

9. Defendants' conduct has resulted in nearly $70 million in Assets Under Management being transferred to Defendants at Crewe or other competitors of BMO.

10. Due to Defendants' wrongful conduct, BMO is seeking immediate injunctive relief (in the form of a preliminary injunction) to enjoin Defendants from soliciting BMO clients, require Defendants to return all BMO Confidential and Trade Secret Information, and cease their unlawful competition.

## THE PARTIES

11. BMO is a national bank chartered by the Comptroller of the Currency of the United States Department of Treasury. BMO has its main office and principal place of business in Illinois.

12. Duncan Corley is a current employee of Crewe and upon information and belief is a resident of Arizona.

13. Louise Goudy Willmering is a current employee of Crewe and upon information and belief is a resident of Arizona.

14. Jason Miller is a current employee of Crewe and upon information and upon information and belief is a resident of Arizona.

15. Kris Yamano is a current employee of Crewe and upon information and upon information and belief is a resident of Arizona.

## JURISDICTION

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because all Plaintiffs and all Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

17. This Court has general personal jurisdiction over Defendants because the Defendants are residents of Arizona.

18. Venue is proper because the actions at issue in this case took place in Arizona, located in the District of Arizona.

## GENERAL ALLEGATIONS

**A.     Defendants' Positions of Responsibility and Trust with BMO**

19. Each Defendant worked at BMO as a member of the Wealth Management group located in and around Scottsdale, Arizona.

*Jason Miller's Employment*

20. Miller originally began working at BMO in 2010 as a Senior Associate of Financial Planning in Scottsdale, receiving an annual salary of $82,000.

21. In 2019, Miller began working as Managing Director for BMO's Arizona Private Bank in the Scottsdale and Tucson offices.

22. In that role, Miller's responsibilities included managing the overall operations within his assigned area to support the growth and profitability of the region. This also included

leading a team of wealth management professionals who provide financial planning and specialized expertise in banking.

23. In his offer letter, Miller agreed to an annual salary of $225,000. Miller was also given the opportunity to be considered for the Senior Manager Equity Program where he could receive an equity award from BMO.

*Kris Yamano's Employment*

24. On May 9, 2016, Yamano begin working at BMO as a Regional Director of Wealth Planning.  In that role she supervised other wealth planners.

25. Yamano was later promoted to Market Manager in the Scottsdale Market.

26. In that role, she oversaw a team of interdisciplinary professionals covering the full spectrum of wealth management services and was second in command for the Arizona Market. Yamano and Miller were the senior leaders for the team and their abrupt and orchestrated departures not only affected client service continuity, but it also adversely affected the entire operation as the key leaders were gone over night.

27. The Scottsdale market is one of BMO's largest markets in its Private Bank sector. Yamano, with Miller, was a leading employee at BMO.

28. Her responsibilities included providing wealth planning, advanced financial planning, guidance, and counsel focused on high net worth and ultra-high net worth client segments. This role included supporting the growth and retention of client assets by providing wealth planning advice and guidance to investment advisors within the region.

29. In her offer letter, Yamano agreed to an annual salary of $175,000 plus a $30,000 signing bonus. Yamano was also given the opportunity to be considered for the Senior Manager Equity Program where she could receive an equity award from BMO in an amount up to $50,000.

*Duncan Corley's Employment*

30. On July 6, 2015, Duncan Corley began working at BMO as a Wealth Advisor in Scottsdale. His title was later changed to Private Wealth Advisor.

31. Corley was paid an annual salary of $175,000 plus a signing bonus of $75,000. Corley was given the ability to earn a Success Bonus that would be determined based on Corley's accomplishments during his first two years of employment.

32. Corley's responsibilities as a Private Wealth Advisor, included providing advisory-based sales and relationship management to attract, retain and grow a portfolio of prospect and client relationships and deliver exceptional client experiences.

*Louise Willmering's Employment*

33. On September 21, 1995, Willmering was hired as a portfolio manager.

34. At the time of her resignation, Willmering was working as a Senior Portfolio Manager on Yamano's team in Scottsdale, Arizona.

35. Her responsibilities included providing high quality investment management services in order to deliver an exceptional client experience. She offered technical expertise on investment management and administration.

**B.     Defendants' Contractual Agreements with BMO**

36. When Defendants Miller, Yamano and Corley accepted a position of employment with BMO, they received an Offer Letter (the "Offer Letter Agreements").

37. In the Offer Letter, Defendants Miller, Yamano and Corley agreed to a Non-Solicitation provision, which stated:

> "During your employment and for twelve months following the end of your employment with the Company, you must not, directly or indirectly solicit: (i) a person who you know is an employee of the Company to leave his or her employment; and (ii) any client of the Company that you serviced during your last twelve months with the Company to offer any product or service that is the same as or similar to any product or service that you provided to that client previously."

38. The Offer Letters also contained a Confidentiality provision which stated:

> "You must protect the confidential and proprietary information of the Company, our clients, suppliers and employees. You must comply with all laws and Company policies that restrict the use, disclosure, collection and access of confidential and proprietary information."

39. Because of the sensitive nature of the Confidential Information, the Offer Letters also contained a provision requiring the return of the information upon any employee's resignation:

> "When your employment with the Company ends, you must return all Company property and all Company and client information, in all formats, and you must not keep any copies."

40. Duncan Corley received and signed his Offer Letter on June 3, 2015, which is attached to this Complaint as **Exhibit A**.

41. Jason Miller received and signed his Offer Letter on or about April 25, 2019, which is attached to this Complaint as **Exhibit B**.

42. Kris Yamano received and signed her Offer Letter on April 14, 2016, which is attached to this Complaint as **Exhibit C**.

43. Additionally, Defendants Willmering, Corley and Miller signed another agreement entitled "Resignation From Employment- Notice Period" (herein after referred to as "the Notice Period Agreement.")

44. In the Notice Period Agreement, Defendants Willmering, Corley and Miller agreed that they would provide BMO with no less than 60-days written notice ("the Notice Period") and agreed to cooperate in any transition and other duties that BMO required.

45. The Notice Period Agreement also contains a non-solicitation provision, which states:

> "….I agree that during the Notice Period, I will be prohibited from directly or indirectly through a third party, and whether as an employee, agent, representative, owner, contractor, sole-proprietor, investor, consultant, or in any other capacity; (i) solicit orders, assets or business of any kind relating to the products and/or services sold by, or that are substantially similar to those sold by the Company from any customer whom I serviced or learned of, or about whom I received confidential information during my employment with the Company...."

46. Miller signed his Notice Period Agreement on October 22, 2012, which is attached to this Complaint as **Exhibit D**.

47. Corley signed his Notice Period Agreement on July 14, 2015, which is attached to this Complaint as **Exhibit E**.

48. Willmering signed her Notice Period Agreement on November 2, 2012, which is attached to this Complaint as **Exhibit F.**

49. While Yamano did not sign a Notice Period Agreement, Yamano's Offer Letter also contained a 60-day notice of resignation provision. See Exhibit C.

50. In addition, at various points in their respective employments with BMO, each Defendant was given the opportunity to participate in an "Omnibus Restricted Share Unit Plan." (the "RSU Plan")

51. Under that plan, certain employees, including the Defendants, were eligible to receive year-end restricted stock unit grants after successfully achieving various performance and service metrics. The RSU awards typically vest after three years and are paid out to the employee based on the value of the shares at the vesting date.

52. Each of the Defendants received RSU awards from BMO. The RSU awards were generous and are offered as an incentive for BMO employees to perform to the best of their abilities.

53. In return for the compensation that they received under the RSU Plan, Defendants agreed to the following non-solicitation provision:

> The Participating Employee shall not during the Restricted Period, on the Participating Employee's own behalf or on behalf of any Person (other than the Bank and its Affiliates), whether directly or indirectly, in all or part of the Territory: (i) solicit for employment or offer employment to any Person or Persons who are employed by the Bank or its Affiliates in the same business unit, division or function in which the Participating Employee worked for the Bank and/or any of its Affiliates at any time during the 12 months preceding the effective date of termination; (ii) solicit, contact, accept business with, enter into a commercial arrangement with any Customer or Supplier for any purpose which competes, in whole or in part, with the Business, or attempt to do so, or persuade or attempt to persuade any Customer or Supplier to discontinue or adversely alter the Customer's or Supplier's relationship with the Bank or its Affiliates; or (iii) take advantage of or derive a benefit or otherwise profit from any business opportunities that the Participating Employee became aware of in the course of employment with the Bank or its Affiliates even if the Bank or its Affiliates do not take advantage of or exploit such opportunities.

54. The RSU Plan provides that the Restricted Period for employees like Defendants is 12 months from the date of the termination of their employment. "Territory" includes areas where the Private Bank does business, including Arizona.

55. The RSU Plan also states that Plan participants may not "directly or indirectly, use, disclose, or otherwise distribute any Confidential Information." Under the terms of the RSU Plan, BMO's Confidential Information includes, but is not limited to, names and lists of customers and employees.

C. **The Defendants' Resignations from BMO**

56. In the weeks leading up to their coordinated resignations, Defendants had private closed-door meetings regarding their move from BMO to Crewe.

57. On July 6, 2021, the Defendants resigned and provided notice to terminate their employment with BMO, effective September 4, 2021.

58. Each Defendant began working for Crewe when their Notice Period expired.

59. In addition to Defendants, a Wealth Analyst, named Kimberly Mawk, also resigned from BMO and began working at Crewe at the same time.

60. On July 21, 2021, counsel for BMO sent letters to each of the Defendants reminding them of their contractual obligations to BMO.

61. Miller, Willmering and Corley were reminded that their Notice Period Agreements required them to give a 60-day notice of termination.

62. Miller, Willmering and Corley were also reminded of the non-solicitation provisions of the Notice Period Agreement that restricted them from soliciting BMO clients during the pendency of the Notice Period.

63. The Defendants Miller, Corley and Yamano were further reminded that the non-solicitation provisions of their Offer Letters would be in effect until September 4, 2022.

64. Finally, Defendants Miller, Corley and Yamano were reminded of the confidentiality provisions of their Offer Letters that prohibited them from using BMO Confidential Information.

65. On September 3, 2021, just before Defendants' Notice Period ended, counsel for BMO sent another reminder letter to Defendants, again reiterating the provisions found in the Offer Letters and the Notice Period Agreements.

66. Accordingly, Defendants and their employer Crewe, were well aware of Defendants' contractual obligations to BMO.

67. On October 1, 2021, counsel for Defendants responded to BMO's letter.

68. In that response, Defendants' counsel indicated Defendants intended to abide by their agreements, would not solicit BMO clients and had not taken BMO's confidential client information.

69. Counsel for Defendants provided sworn declarations for each Defendant, wherein Defendants declared under penalty of perjury that they would abide by their post-employment obligations.

70. Based on these representations, BMO was led to believe Defendants intended to honor the scope of their Agreements with BMO.

**D.     Defendants' Wrongful Conduct**

71. Despite Defendants' sworn declarations to BMO about their post-employment conduct, BMO became aware that Defendants repeatedly violated their Agreements with BMO.

72. Following their official departures from BMO, Defendants began soliciting BMO clients to convince them to transfer to BMO.

73. In some circumstances, Defendants contacted BMO clients on multiple occasions to ask them to leave BMO and begin working at Crewe.

74. In these conversations, Defendants would use their knowledge of BMO's business to compare BMO's business offerings to Crewe, including comparing BMO and Crewe's fees, experience of wealth management team, and other categories of information.

75. Most of Defendants' contacts with clients were done via telephone.

76. However, on multiple occasions, Defendants invited BMO clients to in-person meetings at Crewe in which most, if not all, of the Defendants were present.

77. At those meetings, Defendants made a presentation in which they again attempted to convince clients to transfer from BMO to Crewe.

78. These multiple solicitations were in direct violation of Defendants' employment obligations and/or fiduciary duties to BMO.

9

79. Upon information and belief, Defendants were able to solicit BMO clients because they retained BMO Confidential Information and Trade Secrets after their departures from BMO.

80. Upon information and belief, Defendants used client contacts they only gained through their employment at BMO to contact BMO clients.

81. But for Defendants' access to BMO confidential Client Information and Trade Secrets, Defendants would not have been able to solicit BMO clients in the manner they did.

82. Defendants' conduct to date has resulted in approximately $60 million in Assets Under Management and $450,000 in annual revenue being transferred to them at Crewe.

83. Defendants' conduct to date has also resulted in approximately $21.5 million in Assets Under Management and $255,000 in annual revenue being transferred to other competitors of BMO.

84. Collectively and individually, however, Defendants helped to manage significantly more assets that still remain at BMO, and the potential for irreparable harm to BMO based on Defendants' continued actions is therefore great.

85. The manner and orchestrated timing of Defendants' collective departures, coupled with Defendants' leadership roles in the region, also caused a temporary, but significant disruption for BMO's remaining employees and clients.

## COUNT I

**Misappropriation of Trade Secrets under 18 U.S.C. §§ 1836, *et seq*. (All Defendants)**

86. BMO incorporates every preceding allegation as if restated herein.

87. The actions of Defendants violate the Defend Trade Secrets Act ("DTSA"), U.S.C. §§ 1836, *et seq*.

88. BMO developed, maintained, and possessed Confidential Information and Trade Secrets that include, without limitation, BMO client names and client lists with which BMO conducts business on an ongoing basis.

89. BMO's Confidential Information and Trade Secrets have great economic and commercial value because that information would enable a competitor to usurp business

opportunities from BMO and deprive it of substantial revenue. This information is proprietary and not readily ascertainable by the public or competing companies, such as Crewe.

90. BMO has undertaken reasonable efforts to preserve the confidentiality of its trade secrets and confidential business information.

91. As such, BMO's Confidential Information constitutes trades secrets under the DTSA, 18 U.S.C. 1836, *et seq*.

92. BMO provided Defendants with access to BMO's Confidential Information and Trade Secrets to further their performance as BMO employees.

93. As former employees, Defendants remain under a duty to protect BMO's Confidential Information and Trade Secrets, and refrain from using or disclosing such information.

94. Defendants breached their duty by misappropriating BMO's confidential information and Trade Secrets.

95. Defendants knew or had reason to know that the Confidential Information and Trade Secrets were acquired and that they disclosed that information improperly.

96. As a result of this misappropriation, BMO has been damaged in an amount to be proven at trial.

WHEREFORE, BMO prays the court enter judgment in its favor against Defendants for the following relief:

a. An Injunction preventing Defendants from improperly using or disclosing BMO Confidential Information and Trade Secrets that were obtained as result of Defendants' employment with BMO;

b. An Injunction ordering Defendants to return all BMO Confidential Information or Trade Secrets remaining in their possession;

c. An Injunction enjoining Defendants from soliciting BMO clients in violation of their Agreements with BMO;

d. An award of actual and consequential damages BMO incurred plus proper interest thereon;

e. Because the misappropriation of BMO's Confidential Information and Trade Secrets was willful and malicious, an award of BMO's attorneys' fees and costs; and

f. All other relief this court deems just and proper.

# COUNT II

**Misappropriation of Trade Secrets under Ariz. Rev. Stat. Ann. § 44-401 (All Defendants)**

97. BMO incorporates each preceding allegation as if restated herein.

98. The actions of Defendants violate the Arizona Uniform Trade Secrets Act ("AUTSA"), Ariz. Rev. Stat. Ann. § 44-401 *et seq.*

99. BMO developed, maintained, and possessed Confidential Information and Trade Secrets that include, without limitation, BMO client names, lists, and information with which it conducts business on an ongoing basis.

100. BMO's Confidential Information and Trade Secrets have great economic and commercial value because that information would enable a competitor to usurp business opportunities from BMO and deprive it of substantial revenue. This information is proprietary and not readily ascertainable by the public or competing companies, such as Crewe.

101. BMO has undertaken reasonable efforts to preserve the confidentiality of its trade secrets and confidential business information.

102. As such, BMO's Confidential Information constitutes trades secrets under the AUTSA, Ariz. Rev. Stat. Ann. § 44-401.

103. BMO provided Defendants with access to BMO's Confidential Information and Trade Secrets to further their performance as BMO employees.

104. As former employees, Defendants remain under a duty to protect BMO's Confidential Information and Trade Secrets and refrain from using or disclosing such information.

105. Defendants breached their duty by misappropriating BMO's confidential information and Trade Secrets.

106. Defendants knew or had reason to know that the Confidential Information and Trade Secrets were acquired and that they disclosed that information improperly.

107. As a result of this misappropriation, BMO has been damaged in an amount to be proven at trial.

WHEREFORE, BMO prays the court enter judgment in its favor against Defendants for the following relief:

a. An Injunction preventing Defendants from improperly using or disclosing BMO Confidential Information and Trade Secrets that was obtained as result of Defendants' employment with BMO;

b. An Injunction ordering Defendants to return all BMO Confidential Information or Trade Secrets remaining in their possession;

c. An Injunction enjoining Defendants from soliciting BMO clients in violation of their Agreements with BMO;

d. An award of actual and consequential damages BMO incurred plus proper interest thereon;

e. Because the misappropriation of BMO's Confidential Information and Trade Secrets was willful and malicious, an award of BMO's attorneys' fees and costs; and

f. All other relief this Court deems just and proper.

## COUNT III

### Breach of Fiduciary Duty and Duty of Loyalty (All Defendants)

108. BMO incorporates each and every preceding allegation as if restated herein.

109. While they were employed at BMO, the Defendants held positions of trust and confidence at BMO. Therefore, the Defendants owed BMO a fiduciary duty, including a duty of loyalty.

110. As fiduciaries, the Defendants were obligated, among other things, to act solely for BMO's benefit in all matters connected with their employment and BMO's business.

111. BMO compensated the Defendants for their work throughout their employment at BMO.

112. Nonetheless, during their employment and Notice Period, Defendants breached their respective duties by (a) failing to act solely for BMO's benefit in all matters connected to their employment; (b) using and disclosing BMO's Confidential Information to Crewe; and (c) soliciting BMO customers to transfer to Crewe.

WHEREFORE, BMO prays the court enter judgment in its favor against Defendants for the following relief:

a. Actual and consequential damages including pre-judgment and post-judgment interest thereon;

b. Costs of this action; and

c. All other relief this Court deems just and proper.

## COUNT IV

### Breach of Contract (Defendants Miller, Corley and Yamano)

113. BMO incorporates each and every preceding allegation as if restated herein.

114. The Defendants Miller, Corley and Yamano entered into the Offer Letter Agreement with BMO.

115. Each Agreement was supported by valuable consideration, including generous compensation to Defendants Miller, Corley and Yamano throughout the course of their employment at BMO

116. The Offer Letters contained restrictive covenants including non-solicitation provisions.

117. The non-solicitation provisions of the Agreements are not beyond that which is reasonably necessary to protect BMO's business, are not unreasonably restrictive of the rights of Defendants Miller, Corley and Yamano, and do not contravene public policy.

118. As such, the non-solicitation provisions of the Agreement are enforceable.

119. The Offer Letters also contained a Confidentiality Provision by which Defendants Miller, Corley and Yamano are bound.

120. Defendants Miller, Corley and Yamano breached the terms of the Offer Letters by soliciting BMO clients and using BMO Confidential and Trade Secret Information.

121. The breaches by Defendants Miller, Corley and Yamano damaged BMO in an amount BMO will prove at trial.

WHEREFORE, BMO prays the court enter judgment in its favor against Defendants for the following relief:

a. An Injunction preventing Defendants from improperly using or disclosing BMO Confidential Information and Trade Secrets that was obtained as result of Defendants' employment with BMO;

b. An Injunction ordering Defendants to return all BMO Confidential Information or Trade Secrets remaining in their possession;

c. An Injunction enjoining Defendants from soliciting BMO clients in violation of their Agreements with BMO;

d. An award of actual and consequential damages BMO incurred plus proper interest thereon;

e. Because the misappropriation of BMO's Confidential Information and Trade Secrets was willful and malicious, an award of BMO's attorneys' fees and costs; and

f. All other relief this Court deems just and proper.

## COUNT V

### Breach of Contract (All Defendants)

122. BMO incorporates each and every preceding allegation as if restated herein.

123. At various points in their employment, each Defendant agreed to be bound by the RSU Plan and accepted grants under the terms of the Plan.

124. Each Agreement was supported by valuable consideration, including generous compensation to Defendants in accordance with the RSU Plan.

125. The RSU Plan contains restrictive covenants including non-solicitation provisions with which the Defendants agreed to comply.

126. The non-solicitation provisions of the RSU Plan are reasonable and necessary to protect BMO's business, are not unreasonably restrictive of the rights of Defendants, and do not contravene public policy.

127. As such, the non-solicitation provisions of the RSU Plan are enforceable.

128. Defendants breached the terms of the RSU Plan by soliciting BMO clients, and by using and disclosing BMO's Confidential Information.

129. The breaches by Defendants damaged BMO in an amount BMO will prove at trial.

WHEREFORE, BMO prays the court enter judgment in its favor against Defendants for the following relief:

a. An Injunction preventing Defendants from improperly using or disclosing BMO Confidential Information and Trade Secrets that was obtained as result of Defendants' employment with BMO;

b. An Injunction ordering Defendants to return all BMO Confidential Information or Trade Secrets remaining in their possession;

c. An Injunction enjoining Defendants from soliciting BMO clients in violation of their Agreements with BMO;

d. An award of actual and consequential damages BMO incurred plus proper interest thereon;

e. Because the misappropriation of BMO's Confidential Information and Trade Secrets was willful and malicious, an award of BMO's attorneys' fees and costs; and

f. All other relief this Court deems just and proper.

## COUNT VI

### Tortious Interference with Business Relationships (All Defendants)

130. BMO incorporates each and every preceding allegation as if restated herein.

131. Defendants intentionally and improperly interfered with BMO's contractual relations it had established with its clients.

132. While Defendants were employed at BMO, BMO had valid business relationships with its clients and a business expectancy to client-created revenue.

133. As BMO employees, Defendants were aware of this business expectancy.

134. As a competitor in the industry, Crewe was also aware of this business expectancy.

135. Despite this, Defendants intentionally interfered with BMO's business expectancy by using BMO's Confidential Information and soliciting BMO's clients.

136. As a result of the improper interference, BMO has been damaged in an amount BMO will prove at trial.

WHEREFORE, BMO prays the court enter judgment in its favor against Defendants for the following relief:

a. Actual and consequential damages BMO has incurred as a result of Defendant's interference;

b. Costs of this action;

c. Pre-judgment and post-judgment interest on any award of damages to the extent permitted by law; and

d. All other relief this Court deems just and proper.

# COUNT VII

## Civil Conspiracy (All Defendants)

137. BMO incorporates each and every preceding allegation as if restated herein.

138. Defendants and Crewe, agreed by words and conduct, to use BMO Confidential Information against BMO, to concertedly terminate Defendants' employment from BMO, and to solicit BMO clients in breach of Defendants' contractual agreements with BMO.

139. Defendants then coordinated a mass resignation from BMO and collectively worked to use BMO Confidential Information and solicit BMO clients.

140. Defendants, therefore, accomplished the aim of their conspiracy.

141. As a result of Defendants' wrongful conduct, BMO suffered damage and continues to suffer damages in an amount it will prove at trial.

WHEREFORE, BMO prays the court enter judgment in its favor against Defendants for the following relief:

a. Actual and consequential damages BMO has incurred as a result of Defendant's conspiracy;

b. Costs of this action;

c. Pre-judgment and post-judgment interest on any award of damages to the extent permitted by law; and

d. All other relief this Court deems just and proper.

RESPECTFULLY SUBMITTED this 5th day of April, 2022.

**STINSON LLP**

By: */s/ Sharon W. Ng*
Sharon W. Ng
Michael A. Vincent
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004

**GREENSFELDER, HEMKER & GALE, P.C.**

By: */s/ Christopher A. Pickett*
Christopher A. Pickett
Kathleen Howard
10 S. Broadway, Suite 2000
St. Louis, Missouri 63102

Attorneys for Plaintiff