**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| BMO Harris Bank NA, | No. CV-22-00547-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Duncan Corley, et al., | |
| Defendants. | |

In this action, Plaintiff BMO Harris Bank NA, d/b/a BMO Private Bank ("BMO") asserts tort and contract claims against four of its former employees, Defendants Duncan Corley, Jason Miller, Louise Goudy Willmering, and Kris Yamano (collectively, "Defendants"), who resigned in coordinated fashion from BMO's Wealth Management group, joined a competitor, and then allegedly used misappropriated trade secrets to solicit BMO's customers.

Now pending before the Court is Defendants' motion to dismiss. (Doc. 15.) The motion is fully briefed (Docs. 21, 22) and neither side requested oral argument. For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

The following facts, taken as true, are derived from the complaint.

Defendants are former employees of BMO's Wealth Management group. (Doc. 1 ¶ 19.) Defendants worked in and around Scottsdale, Arizona, which "is one of BMO's largest markets in its Private Bank sector." (*Id.* ¶¶ 19, 27.)

1       In 2010, Miller started working at BMO as a Senior Associate of Financial Planning.

2   (*Id.* ¶ 20.)  In 2019, Miller was promoted to the position of Managing Director for BMO's

3   Arizona Private Bank, with an annual salary of $225,000.  (*Id.* ¶¶ 21, 23.)  In that position,

4   Miller "[led] a team of wealth management professionals" and "manag[ed] the overall

5   operations within his assigned area."  (*Id.* ¶ 22.)  During his tenure at BMO, Miller signed

6   the Omnibus Restricted Share Unit Plan ("RSU Plan") (*id.* ¶¶ 52, 53), the Offer Letter

7   Agreement (*id.* ¶¶ 36, 41), and the Resignation From Employment-Notice Period form

8   ("Notice Period Agreement") (*id.* ¶¶ 43, 46).

9       In 2016, Yamano started working at BMO as a Regional Director of Wealth

10  Planning.  (*Id.* ¶ 24.)  Yamano was eventually promoted to Market Manager, where she

11  was "second in command for the Arizona Market."  (*Id.* ¶¶ 25-26.)  As Market Manager,

12  Yamano "focused on high net worth and ultra-high net worth client segments," meaning

13  that she "support[ed] the growth and retention of client assets by providing wealth planning

14  advice and guidance to investment advisors within the region."  (*Id.* ¶ 28.)  Yamano's

15  annual salary was $175,000, plus a $30,000 signing bonus and some company equity.  (*Id.*

16  ¶ 29.)  During her tenure at BMO, Yamano signed both the RSU Plan (*id.* ¶¶ 52, 53) and

17  the Offer Letter Agreement (*id.* ¶¶ 36, 42).

18      In 2015, Corley started working at BMO as a Wealth Advisor.  (*Id.* ¶ 30.)  Corley's

19  annual salary was $175,000, and he received a signing bonus of $75,000 and had additional

20  bonus opportunities.  (*Id.* ¶ 31.)  Corley's job required that he "attract, retain and grow a

21  portfolio of prospect and client relationships and deliver exceptional client experiences."

22  (*Id.* ¶ 32.)  During his tenure at BMO, Corley signed the RSU Plan (*id.* ¶¶ 52, 53), the Offer

23  Letter Agreement (*id.* ¶¶ 36, 40), and the Notice Period Agreement (*id.* ¶¶ 43, 47).

24      In 1995, Willmering started working at BMO as a portfolio manager.  (*Id.* ¶ 33.)

25  "At the time of her resignation, [she] was working as a Senior Portfolio Manager" under

26  Yamano.  (*Id.* ¶ 34.)  During her tenure at BMO, Willmering signed both the RSU Plan (*id.*

27  ¶¶ 52, 53) and the Notice Period Agreement (*id.* ¶¶ 43, 48).

28      On July 6, 2021, Defendants simultaneously tendered their resignations.  (*Id.* ¶¶ 56-

58.)  On September 4, 2021 (*i.e.*, after the 60-day notice period specified in their respective Notice Period Agreements had expired), Defendants began working at Crewe Advisors, Inc. ("Crewe"), a competitor of BMO.  (*Id.* ¶¶ 6, 58.)

Since Defendants resigned from BMO and began working at Crewe, various former BMO clients have transferred their accounts to Crewe, resulting in the loss (from BMO's perspective) of $60 million in assets under management and $450,000 in annual revenue.  (*Id.* ¶ 82.)  Additionally, another $21.5 million in assets were transferred from BMO to other competitors, resulting in the loss of an additional $255,000 in revenue.  (*Id.* ¶ 83.)

To convince BMO's clients to transfer their accounts to Crewe, Defendants "use[d] their knowledge of BMO's business to compare BMO's business offerings to Crewe, including comparing BMO and Crewe's fees, experience of wealth management team, and other categories of information."  (*Id.* ¶ 74.)  BMO contends this endeavor was successful because Defendants misappropriated BMO's trade secrets and leveraged confidential information in violation of various contractual agreements.  (*Id.* ¶¶ 71-85.)  The key terms of those agreements are as follows:

▪ RSU Plan:  Under the RSU Plan, Defendants could not (1) "solicit for employment or offer employment to any Person or Persons who are employed by" BMO for 12 months following the termination of employment; (2) "solicit, contact, accept business with, [or] enter into a commercial arrangement with any Customer or Supplier for any purpose which competes . . . with the Business" for 12 months following the termination of employment; (3) "take advantage of or derive a benefit or otherwise profit from any business opportunities" the employee learned about during the course of employment; or (4) "directly or indirectly, use, disclose, or otherwise distribute any Confidential Information."  (*Id.* ¶¶ 53-55.)  This provision is applicable in "areas where [BMO] does business, including Arizona."  (*Id.* ¶ 54.)

▪ Offer Letter Agreement:  Similarly, the Offer Letter Agreement, which was signed by Miller, Yamano, and Corley, provided as follows: "During your employment and for twelve months following the end of your employment . . . you must not, directly or

indirectly solicit: (i) a person who you know is an employee of [BMO] to leave his or her employment; and (ii) any client of [BMO] you serviced during your last twelve months with [BMO] to offer any product or service that is the same as or similar to any product or service that you provided to that client previously." (*Id.* ¶ 37.) The Offer Letter Agreement also included a confidentiality clause to "protect the confidential and proprietary information of the Company, our clients, suppliers, and employees." (*Id.* ¶ 38.) Signatories were also required to "return all Company and client information" upon termination. (*Id.* ¶ 39; Doc. 1-2 at 4 [actual Offer Letter Agreement].)[1]

▪ Notice Period Agreement:  Under this contract, Defendants had to "provide BMO with no less than 60-days written notice" before resigning and "cooperate in any transition." (Doc. 1 ¶ 44.) The Notice Period Agreement also prohibited the solicitation of "orders, assets or business of any kind relating to the products and/or services sold by, or that are substantially similar to those sold by the Company," during that 60-day notice period. (*Id.* ¶ 45; Doc. 1-2 at 17 [actual Notice Period Agreement].)

## LEGAL STANDARD

"[T]o survive a motion to dismiss under Rule 12(b)(6), a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).  "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1444-45 (citation omitted).  However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80.  Moreover, "[t]hreadbare recitals of the elements of

---

[1]    Documents attached to the complaint may be considered without converting the motion to dismiss into a motion for summary judgment if the documents' "authenticity . . . is not contested" and "the plaintiff's complaint necessarily relies on them." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Circ. 2001) (quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1998)).  BMO's complaint hinges on these agreements and Defendants have not contested their authenticity.

a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 679. The court also may dismiss due to "a lack of a cognizable theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

## DISCUSSION

Defendants move to dismiss all seven claims in the complaint.  (Doc. 15.)  For convenience and analytical clarity, some of those claims are grouped together below.

I.    Misappropriation Of Trade Secrets

In Count I, BMO asserts that Defendants violated the Defend Trade Secrets Act ("DTSA").  (Doc. 1 ¶¶ 86-96.)  DTSA defines a "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information" that "(A) the owner thereof has taken reasonable measures to keep. . . secret"; and (B) "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).  "To succeed on a claim for misappropriation of trade secrets under the DTSA, a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff."  *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 657-58 (9th Cir. 2020).

In Count II, BMO asserts that Defendants violated the Arizona Uniform Trade Secrets Act ("AUTSA").  (Doc. 1 ¶¶ 97-107.)  Under AUTSA, a trade secret is defined as "information, including a formula, pattern, compilation, program, device, method, technique or process, that both: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use"; and "(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  *Orca Commc'ns Unlimited, LLC v. Noder*, 337 P.3d 545, 547 (Ariz. 2014) (quoting A.R.S. § 44-401(4)).  "Under Arizona law, misappropriation of a trade secret

- 5 -

includes the '[d]isclosure or use of a trade secret of another without express or implied consent by a person' who '[a]t the time of the disclosure or use,' 'knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . .'" *HTS, Inc. v. Boley*, 954 F. Supp. 2d 927, 945 (D. Ariz. 2013) (quoting A.R.S. § 44-401).

Because the claims are substantially similar, the Court will analyze them together. *InteliClear*, 978 F.3d at 657.

Defendants seek dismissal of the misappropriation claims on three overarching grounds. First, Defendants contend that "the complaint lacks sufficient detail to make Defendants aware of specifically what information was allegedly misappropriated." (Doc. 15 at 5-6.) Second, Defendants contend that, assuming BMO's customer lists are the alleged trade secrets at issue, such lists do not qualify as trade secrets because "the complaint does not allege facts indicating what, beyond a listing of names that could be gathered from any public source, was contained in the set of information that Defendants allegedly retained after their employment with BMO had ended." (*Id.* at 6-7.) Third, Defendants argue that BMO "has not explained how it kept its client lists from being accessed by non-employees." (*Id.* at 7.)

### A.    **Trade Secrets—Specificity**

"A plaintiff seeking relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998) (citation and internal quotation marks omitted). However, at the pleading stage, "a plaintiff need not spell out the details of the trade secret." *Arthur J. Gallagher & Co. v. Tarantino*, 498 F. Supp. 3d 1155, 1171 (N.D. Cal. 2020) (citation omitted). Instead, "the basic test is (1) whether something beyond general knowledge [in the profession] is being claimed and (2) whether there is enough specificity to put the defendant on notice of what the theft is about." *Id.*

The complaint alleges that "BMO developed, maintained, and possessed Confidential Information and Trade Secrets that include, without limitation, BMO client

1    names and client lists with which BMO conducts business on an ongoing basis." (Doc. 1

2    ¶ 88.)  Elsewhere, the complaint reiterates that the information at issue includes "BMO

3    client names[] and lists." (*Id.* ¶ 99.)  These allegations are sufficiently specific to put

4    Defendants on notice of what the theft is about. *InteliClear*, 978 F.3d at 658.[2]

5         B.    **Trade Secrets—Sufficiency**

6         Defendants next argue that the complaint fails to establish that BMO's client names

7    and client lists actually qualify as trade secrets. (Doc. 15 at 6-7.)  Defendants elaborate:

8    "The complaint does not allege facts indicating what, beyond a listing of names that could

9    be gathered from any public source, was contained in the set of information that Defendants

10   allegedly retained after their employment with BMO had ended." (*Id.*)

11        This argument is unavailing.  As the Arizona Court of Appeals has explained, "[i]n

12   the context of customer lists, trade secret protection does not depend on whether the 'list'

13   misappropriated is in written form or memorized.  Rather, courts have identified several

14   factors to determine whether a customer list qualifies as a trade secret." *Calisi v. Unified*

15   *Fin. Servs.*, 302 P.3d 628, 631 (Ariz. Ct. App. 2013).  Those factors include whether the

16   list (1) "represents a selective accumulation of detailed, valuable information about

17   customers—such as their particular needs, preferences, or characteristics—that naturally

18   would not occur to persons in the trade or business"; (2) was "compiled . . . by expending

19   substantial efforts to identify and cultivate [a] customer base such that it would be difficult

20   for a competitor to acquire or duplicate the same information"; (3) "derives independent

21   economic value from its secrecy, and gives the holder of the list a demonstrable competitive

22   advantage over others in the industry"; and (4) was "divulged . . . externally and internally,

23   *i.e.*, to people outside of [the holder's] business as well as to its own employees." *Id.* at

24   _____

[2]        The one caveat is the allegation in paragraph 99 that Count II may be based in part
25   on Defendants' misappropriation of "information with which [BMO] conducts business on
     an ongoing basis."  To the extent this "information" somehow differs from BMO's client
26   names and client lists (which are separately enumerated in paragraph 99 as objects of the
     misappropriation claim), it is too vague and general to suffice. *InteliClear*, 978 F.3d at 658
27   ("Plaintiffs may not simply rely upon 'catchall' phrases or identify categories of trade
     secrets they intend to pursue at trial.").  But because BMO elsewhere provides a sufficiently
28   clear identification of the trade secrets giving rise to its misappropriation claims, this one
     instance of overbreadth does not require dismissal.

631-32 (citations and internal quotation marks omitted).

Here, although the complaint does not contain express factual allegations regarding some of these considerations (and, as Defendants correctly note, it would be inappropriate to allow BMO to effectively supplement its complaint by advancing such factual allegations for the first time in its response to the motion to dismiss), the factual allegations that *are* contained within the complaint are sufficient to plausibly establish that BMO's customer lists do, in fact, qualify as trade secrets.  In addition to alleging that the customer lists are composed of "information [that] is proprietary and not readily ascertainable by the public or competing companies, such as Crewe," the complaint specifically alleges that at least one Defendant (Yamano) focused her work on clients in the "high net worth and ultra-high net worth client segments."  (Doc. 1 ¶¶ 28, 89.)  The Court has little trouble concluding that a list of such clients could plausibly qualify as a trade secret—common sense suggests that a bank would need to expend substantial efforts to identify the narrow universe of ultra-wealthy customers who might be interested in private banking and wealth management services and that such a list would be quite valuable from the bank's perspective and provide an advantage over competitors in the industry.  *See generally Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").  If a bank did not have such a list, and thus had to resort to cold-calling numbers in the phone book in the hope the recipient might be interested in high-end wealth management services, the inefficiencies would be obvious.  *Cf. MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) ("We agree that the Customer Database qualifies as a trade secret.  The Customer Database has potential economic value because it allows a competitor like Peak to direct its sales efforts to those potential customers that are already using the MAI computer system.").

C.     **Measures To Maintain Secrecy**

Defendants argue that "simply using confidentiality clauses in employment agreements, or limiting former employees' access to client information, is not enough to

transform basic confidential information into a trade secret." (Doc. 15 at 7.)  Defendants further argue that, "[b]eyond a conclusory assertion that it has 'undertaken reasonable efforts to preserve the confidentiality of its trade secrets,' BMO has not explained how it kept its client lists from being accessed by non-employees, including through public access to BMO employee social media profiles and connections." (*Id.*)

These arguments are unpersuasive.  "Just as the trade secret's owner is obliged to establish that the matter is secret, it must also show that it exercised reasonable care to safeguard the secret." *Enter. Leasing Co. of Phx. v. Ehmke*, 3 P.3d 1064, 1070 (Ariz. Ct. App. 1999).  "Indeed, the most important factor in gaining trade-secret protection is demonstrating that the owner has taken such precautions as are reasonable under the circumstances to preserve the secrecy of the information." *Id.*

Here, BMO alleges that it sought to maintain the secrecy of its customer lists by having Defendants sign the RSU Plan, which forbade the disclosure of client lists (Doc. 1 ¶ 55); by having Defendants sign the Offer Letter Agreement, which required Defendants to protect confidential information and return all company property and confidential information after employment ends (*id.* ¶¶ 38-39); and by sending letters to Defendants soon after receiving their resignation notices that reminded Defendants of their obligations to honor these agreements (*id.* ¶¶ 60-69).  Courts have found that similar allegations are sufficient to satisfy the reasonable-precaution requirement in a trade-secrets case. *See, e.g.*, *W.L. Gore & Associates, Inc. v. GI Dynamics, Inc.*, 2010 WL 5184254, *8 (D. Ariz. 2010) ("GID has also alleged with sufficient particularity its efforts to protect and maintain the secrecy of its trade secrets, including two confidential disclosure agreements with Gore, and expressly marking all of its presentations as 'confidential.'"); *Enter. Leasing*, 3 P.3d at 1071 ("Not only did Enterprise make reasonable efforts to ensure the confidentiality of the information, such as limited disclosure to those employees in need of the information to perform their duties and general directives regarding confidentiality, but it specifically included a confidentiality provision in its employment agreement for high-level managers such as Ehmke, as well as in the employee policy handbook that all employees had to

acknowledge and sign.  These measures demonstrate adequate safeguards to protect the financial documents and the Worksheet."); *InteliClear*, 978 F.3d at 660-61 (upholding confidentiality agreements as "reasonable steps to maintain secrecy").

II.   Fiduciary Duty/Duty of Loyalty

In Count III, BMO alleges that the Defendants breached their fiduciary duties and duties of loyalty to BMO by "(a) failing to act solely for BMO's benefit in all matters connected to their employment; (b) using and disclosing BMO's confidential information to Crewe; and (c) soliciting BMO customers to transfer to Crewe."  (Doc. 1 ¶ 112.)

Under Arizona law, an employee has a fiduciary duty not to "'compete with his employer concerning the subject matter of the employment' during the period of employment."  *HTS, Inc.*, 954 F. Supp. 2d at 946 (quoting *Sec. Title Agency, Inc. v. Pope*, 200 P.3d 977, 989 (Ariz. Ct. App. 2008)).  Although an employee may make arrangements to compete "[b]efore termination," the employee "cannot properly use confidential information peculiar to his employer's business and acquired therein" or "solicit customers for such rival business before the end of his employment."  *Id.* (quoting *McCallister Co. v. Kastella*, 825 P.2d 980, 982 (Ariz. Ct. App. 1992)).

Defendants argue that Count III fails to state a claim because the complaint "does not allege that Defendants competed with BMO during their employment" and instead "expressly states that it was not until after Defendants had left BMO's employment that they allegedly began to solicit BMO clients."  (Doc. 15 at 10, capitalization omitted.)  In response, BMO argues that the complaint does, in fact, allege that Defendants "beg[a]n using BMO's confidential information against it while Defendants were still employed at BMO."  (Doc. 21 at 12.)  In support of this contention, BMO cites paragraph 56 of the complaint.  (*Id.*)  In reply, Defendants accuse BMO of relying "on phantom allegations that cannot be found anywhere within the four corners of its Complaint."  (Doc. 22 at 9-10.)  Defendants contend that paragraph 56 is "woefully insufficient" to establish that any misconduct occurred during their term of employment because it simply references meetings that occurred before they resigned, without any specifics as to what was discussed

during those meetings.  (*Id.*)  Defendants contend that BMO's theory is also contradicted by paragraph 72 of the complaint, which specifically alleges that the solicitation efforts did not begin until after they resigned.  (*Id.*)

Defendants have the better of this argument.  Although paragraph 112 of the complaint asserts in conclusory fashion that Defendants breached their duties "during their employment and notice period," the only factual allegation offered to support this assertion is paragraph 56, which reads, in its entirety, as follows: "In the weeks leading up to their coordinated resignations, Defendants had private closed-door meetings regarding their move from BMO to Crewe."  This allegation is insufficient because the act of planning to move to a competitor does not, in itself, constitute a breach of loyalty or breach of fiduciary duty.  *HTS, Inc.*, 954 F. Supp. 2d at 946.  *See also Firetrace USA, LLC v. Jesclard*, 800 F. Supp. 2d 1042, 1053 (D. Ariz. 2010) ("Defendants are correct that preparation to compete is not enough to support a breach of fiduciary duty claim.").

If BMO had alleged more details concerning these pre-resignation meetings, such as that Defendants agreed to begin copying client lists before the resignation date, the analysis might be different.  After all, "[t]he line separating mere preparation from active competition may be difficult to discern in some cases" and ultimately presents "a question of fact to be decided by the trier of fact based on a consideration of all the circumstances of the case."  *Firetrace USA*, 800 F. Supp. 2d at 1053 (citations and internal quotation marks omitted).  However, such details are wholly lacking here.  Additionally, in paragraph 72, BMO alleges that it was only "[f]ollowing their official departures" that Defendants "began soliciting BMO clients."  BMO makes no effort to reconcile this allegation with its theory that the misconduct actually started earlier, during the employment and notice period.

III.   Breach Of Contract

The complaint includes two breach-of-contract claims: one for breach of the RSU Plan against all Defendants (Count V) and one for breach of the Offer Letter Agreement against Miller, Corley, and Yamano (Count IV).  Neither claim alleges violations of the

Notice Period Agreement.  (Doc. 15 at 7 n.1.)

BMO alleges that Defendants breached the non-solicitation and confidentiality portions of these agreements by "soliciting BMO clients and using BMO Confidential and Trade Secret Information." (Doc. 1 ¶¶ 120, 128.)  Defendants, in turn, move to dismiss on the ground that both sets of covenants are overbroad and unenforceable.  (Doc. 15 at 7-9.) The parties' more specific arguments are summarized in additional detail below.

Under Arizona law, restrictive covenants in the employee-employer context are, in general, unenforceable if they are "(1) beyond that reasonably necessary for the protection of the employer's business; (2) unreasonably restrictive upon the rights of the employee; [or] (3) in contravention of public policy." *Lessner Dental Labs., Inc. v. Kindey*, 492 P.2d 39, 40-41 (Ariz. Ct. App. 1971).  "Reasonableness is a fact-intensive inquiry that depends on the totality of the circumstances." *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1283 (Ariz. 1999).

Because the legal requirements for non-solicitation agreements and confidentiality agreements differ, the Court will discuss them separately even though the counts are broken up by agreement.

### A.     **Non-Solicitation**

"Because [a non-solicitation agreement] is less restrictive on the employee (and thus on free market forces) than a covenant not to compete, [such an] agreement ordinarily is not deemed unreasonable or oppressive." *Hilb, Rogal & Hamilton Co. of Ariz. v. McKinney*, 946 P.2d 464, 467 (Ariz. Ct. App. 1997).[3]  "Nevertheless, [such an] agreement may be so restrictive in its scope and result that it is unenforceable. . . .  A restrictive covenant—whether a covenant not to compete or [a non-solicitation] agreement—is enforceable as long as it is no broader than necessary to protect the employer's legitimate business interest.  The burden is on the employer to prove the extent of its protectable interest." *Id.* (citations omitted).

---

[3]     Non-solicitation agreements must be ancillary to an otherwise legally enforceable contract.  *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 979-80 (D. Ariz. 2006). Defendants do not contest the underlying validity of the contracts here.

"In the commercial context, it is clear that employers have a legitimate interest in retaining their customer base." *Valley Med. Specialists*, 982 P.2d at 1284.  Accordingly, Arizona courts frequently uphold agreements that prohibit solicitation for a one-year period following employment.  *See, e.g.*, *Compass Bank*, 430 F. Supp. 2d at 980-81 (upholding one-year non-solicitation agreement and collecting cases).  However, businesses have "no protectable interest in persons or entities or customers when the employer has no business ties to them."  *Orca Commc'ns Unlimited LLC v. Noder*, 314 P.3d 89, 96 (Ariz. Ct. App. 2013) (striking down a non-solicitation agreement that applied to actual, potential, and former customers as broader than necessary to protect the business's legitimate interests), *overruled and ordered partially depublished on other grounds*, 337 P.3d 545 (Ariz. 2014).

As for the geographic scope of non-solicitation agreements, courts have suggested that it would be inappropriate to find overbreadth and unenforceability on this basis. *GlobalTranz Enters. Inc. v. Shipper's Choice Glob. LLC*, 2017 WL 11609546, *8 (D. Ariz. 2017) ("It is undisputed that a non-compete provision must have a reasonable geographic scope . . . [but] it is not clear how geographic limitations would even work in the context of non-solicitation provisions.  It is undisputed that GlobalTranz can lawfully prohibit its former employees from soliciting at least some of its current customers and those customers may be located across the country.  Given that, geographic limitations would make no sense.") (citations omitted).  At any rate, the Arizona Supreme Court has suggested that statewide enforcement of a non-solicitation agreement would be appropriate if its scope were limited to the company's current clients.  *Olliver/Pilcher Ins., Inc. v. Daniels*, 715 P.2d 1218, 1219-20 (Ariz. 1986).

The RSU Plan's non-solicitation provision provides in relevant part as follows:

> The Participating Employee shall not during the Restricted Period . . . solicit, contact, accept business with, enter into a commercial arrangement with any Customer or Supplier for any purpose which competes, in whole or in part, with the Business, or attempt to do so, or persuade or attempt to persuade any Customer or Supplier to discontinue or adversely alter the Customer's or Supplier's relationship with the Bank or its Affiliates . . . .

(Doc. 1 ¶ 53.)  The Restricted Period means "12 months from the date of the termination

of their employment." (*Id.* ¶ 54.) "Territory" means "areas where the Private Bank does business, including Arizona." (*Id.*)

The Offer Letter Agreement's non-solicitation provision provides:

During your employment and for twelve months following the end of your employment with the Company, you must not, directly or indirectly solicit . . . any client of the Company that you serviced during your last twelve months with the Company to offer any product or service that is the same as or similar to any product or service that you provided to that client previously.

(Doc. 1 ¶ 37; Doc. 1-2 at 4.)

Defendants contend that both non-solicitation provisions are unenforceable because their geographic scope and customer reach are "unreasonably broad" and because the complaint lacks factual allegations to demonstrate "the restrictions are reasonable and no broader than necessary to protect BMO's legitimate interests." (Doc. 15 at 8-9.) BMO responds that the non-solicitation provisions are sufficiently narrow for four related reasons: (1) 12-month restrictions are routinely upheld in Arizona; (2) the term "Customers" is defined for the purposes of the non-solicitation provisions as "clients with whom they actually worked or interacted," which is sufficiently narrow; (3) non-solicitation provisions do not require a geographic scope, given that "customers may be located across the country"; and (4) the provisions do not include non-*competition* clauses, but merely restrict the *solicitation* of current clients, and thus Defendants "can continue in the exact same career path, in the same positions, in the same industry, in the same geographic region. They are simply prohibited during the restricted period, from soliciting current BMO clients with whom they previously dealt." (Doc. 21 at 7-12.) In reply, Defendants argue that restrictive covenants are disfavored in the employee-employer context; that the non-solicitation provisions are not limited to current BMO clients, but would also encompass a former BMO client that was not "still a client of BMO when the Defendants left"; and that BMO has not established that its proffered definition of the term "customer" applies to the RSU Plan. (Doc. 22 at 7-8.) Defendants conclude: "BMO . . . fails to allege any facts concerning what legitimate business interest it has in preventing

1   Defendants from contacting any client with whom they had contact in their last 12 months
2   of employment, for another year following the end of employment, regardless of where in
3   the country that client is located or whether that client still receives services from BMO."
4   (*Id.*)

5          The Court agrees, in the main, with BMO's arguments on these points and concludes
6   that the non-solicitation provisions are not so overly broad as to preclude enforcement, at
7   least at the motion-to-dismiss stage.  First, a 12-month time frame to not solicit customers
8   has routinely been upheld as reasonable to protect an employer's legitimate interest in
9   customer retention.  *Compass Bank*, 430 F. Supp. 2d at 980-81.  Nor is there any merit to
10  Defendants' contention that the "complaint is devoid of any plausible facts suggesting that
11  the temporal . . . restrictions are reasonable and no broader than necessary."  (Doc. 15 at 8-
12  9.)  BMO alleges that the loss in client relationships has already cost it "$450,000 in annual
13  revenue" and that "significantly more" assets remain at BMO that are threatened by
14  Defendants' conduct.  (Doc. 1 ¶¶ 82-84.)  These factual allegations support the conclusion
15  that BMO has an interest in customer retention and Arizona law supports a 12-month
16  restriction to protect that interest.

17         Second, even accepting that the anti-solicitation provisions might be unenforceable
18  under *Orca Communications* if construed to prohibit the solicitation of BMO's *former*
19  clients, there is, at a minimum, ambiguity over whether the provisions extend in this
20  fashion.   For example, under the RSU Plan, Defendants are prohibited "during the
21  Restricted Period"—that is, during the 12-month period following their departure—from
22  soliciting the business of any "Customer."  (Doc. 1 ¶ 53.)  Although there is no indication
23  in the present record as to whether the term "Customer" is expressly defined elsewhere in
24  the RSU Plan, contextual clues within the non-solicitation provision itself suggest that the
25  term applies only to customers who remained customers of BMO during the 12-month
26  post-employment period.   Specifically, the second clause of subsection (ii) prohibits
27  "attempt[ing] to persuade any Customer . . . to discontinue or adversely alter the
28  Customer's . . . relationship with the Bank."  (*Id.*)  This verbiage would make little sense

if the term "Customer" included former BMO clients or potential future BMO clients, because in those instances there would be no existing "relationship with the Bank" for Defendants to attempt to "discontinue or adversely alter."  At a minimum, the meaning of the term "Customer" under the RSU Plan is too ambiguous to support a conclusive ruling in Defendants' favor at this stage of the case.  *See generally Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1118 (9th Cir. 2018) ("If a contract is ambiguous, it presents a question of fact inappropriate for resolution on a motion to dismiss.").  Similarly, under the Offer Letter Agreement, the covered Defendants are precluded from soliciting, during the 12-month period following their departure, "any client of the Company that you serviced during your last twelve months with the Company." (*Id.* ¶ 37.)  Once again, one common-sense reading of this language is that it is limited to entities that remained BMO clients following Defendants' departure, and at a minimum there is ambiguity that precludes dismissal.

Finally, the anti-solicitation provisions are not unenforceable due to geographic overbreadth.  Defendants do not cite any case holding that a 12-month non-solicitation agreement limited to the employer's current clients could be deemed unenforceable based on the fortuity of where those clients happen to be located and the Court agrees with the analysis in *GlobalTranz Enterprises* that it would not make sense to invalidate a non-solicitation agreement on that basis.

### B.  **Confidentiality**

Enforcement of confidentiality agreements requires striking a careful balance between protecting truly confidential business information, like trade secrets, and protecting the employee's right to keep and use the valuable skills acquired while working. *Amex Distributing Co. v. Mascari*, 724 P.2d 596, 602-03 (Ariz. Ct. App. 1986).  "[A] true trade secret is entitled to protection of indefinite duration, [but] the same is not true of customer information, especially in a field where customers are known and generally accessible to competitors."  *Id.* at 603 (internal citations omitted).  Thus, confidentiality covenants will not be upheld when they are overbroad, such as when they include "all information . . . acquired" by an employee. *Orca Commc'ns*, 314 P.3d at 94-95.  Extreme

overbreadth in a confidentiality agreement can be tantamount to a covenant not to compete. *Id.* at 95.

The RSU Plan's confidentiality clause provides that Plan participants "may not 'directly or indirectly, use, disclose, or otherwise distribute any Confidential Information,'" which "includes, but is not limited to, names and lists of customers and employees."  (Doc. 1 ¶ 55.)

The Offer Letter Agreement's confidentiality provision provides: "You must protect the confidential and proprietary information of the Company, our clients, suppliers and employees.  You must comply with all laws and Company policies that restrict the use, disclosure, collection and access of confidential and proprietary information."  (Doc. 1 ¶ 38; Doc. 1-2 at 4.)

Defendants argue these confidentiality provisions are overbroad and unenforceable because they encompass public information and lack temporal and geographic restrictions. (Doc. 15 at 9.)  BMO, unfortunately, says almost nothing in response.  Nearly all of BMO's responsive briefing concerns the enforceability of the non-solicitation provisions.  (Doc. 21 at 7-12.)  The only discussion of the confidentiality provisions appears in footnote 3, which simply asserts that "BMO's confidentiality provisions are valid contractual provisions that seek to enforce BMO's confidential information" and cites one case, *Farm Bureau Prop. & Cas. Ins. Co. v. McEldowney*, 2015 WL 12941880 (D. Ariz. 2015), in support of this assertion.  In reply, Defendants focus on the non-solicitation provisions and do not separately address the enforceability of the confidentiality provisions.

The record regarding the enforceability of the confidentiality provisions is underdeveloped.  BMO's reliance on *Farm Bureau* is misplaced because the contract in that case specifically defined the term "Confidential Information" to exclude "information which Agent has confirmed is publicly known."  2015 WL 12941880 at *1.  But here, the record does not reveal whether either contract provided a definition of the term "Confidential Information," let alone whether that definition clarified that publicly known information was excluded.  In *Orca Communications*, the Arizona Court of Appeals held

that a confidentiality provision was unenforceable because its "definition of 'confidential information'" included "any information [the defendant] learn[ed] of, possess[ed] as a result of, or access[ed] through employment' with Orca" and thus "extend[ed] far beyond the 'truly confidential.'"  314 P.3d at 416-17.  It is possible that the confidentiality provisions here may run afoul of this principle, but because the parties have not provided them and BMO has not provided much in the way of responsive briefing, it is difficult to provide any meaningful analysis.

Even if the confidentiality provisions *were* independently unenforceable, Counts IV and V would not be subject to dismissal because those claims are also based on alleged breaches of the non-solicitation provisions.  Thus, the Court declines at this time to reach any definitive conclusions about the enforceability of the confidentiality provisions.

IV.   Tortious Interference

In Count VI, BMO alleges that Defendants "intentionally and improperly interfered with BMO's contractual relations it had established with its clients" by "using BMO's Confidential Information and soliciting BMO's clients." (Doc. 1 ¶¶ 131, 135.)  As relief, BMO seeks "actual and consequential damages," "costs," and "interest." (*Id.* ¶ 136.)

Under Arizona law, "[t]o establish a *prima facie* case of intentional interference with contractual relations, a plaintiff must prove: the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship or expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted.  In addition, the interference must be 'improper as to motive or means' before liability will attach." *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 909 P.2d 486, 494 (Ariz. Ct. App. 1995) (citation omitted).

Defendants argue Count VI is barred by the economic loss rule or preempted by AUTSA.  (Doc. 15 at 11-12.)  Defendants also argue the non-solicitation provision is unenforceable and therefore cannot serve as the foundation for the tortious interference claim.  (Doc. 22 at 11.)

The economic loss rule ("ELR") limits "a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property." *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 P.3d 664, 667 (Ariz. 2010). The doctrine is not applied mechanically, and instead requires the court to consider the "relevant policy concerns" presented by the individual factual situation. *Id.* at 673. One such policy consideration is the different purposes that contractual and tort remedies serve: "Generally, contract law enforces the expectancy interests between contracting parties and provides redress for parties who fail to receive the benefit of their bargain . . . . Tort law, in contrast, seeks to protect the public from harm to person or property." *QC Constr. Prods., LLC v. Cohill's Bldg. Specialties, Inc.*, 423 F. Supp. 2d 1008, 1015 (D. Ariz. 2006) (quoting *Carstens v. City of Phx.*, 75 P.3d 1081, 1083 (Ariz. Ct. App. 2003)).

Defendants argue that the "tortious interference claim relies on Defendants' alleged failure to abide by the terms of *contracts* between BMO and each Defendant" and therefore "BMO is limited to its contractual remedies." (Doc. 15 at 11.) BMO counters that, because Arizona law is unsettled on whether the ELR applies outside the context of products liability and construction defect cases, the Court cannot bar Count VI at this stage. (Doc. 21 at 13-14.) In reply, Defendants argue that the ELR is not so limited, as courts have applied it to bar fraud, misrepresentation, and tortious interference claims. (Doc. 22 at 10.)

A federal court adjudicating state-law claims should "approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Ticknor v. Choice Hotels Int'l., Inc.*, 265 F.3d 931, 939 (9th Cir. 2001) (quoting *Gee v. Tenneco*, 615 F.2d 857, 861 (9th Cir. 1980)). Therefore, the Court declines BMO's seeming invitation to let the claim proceed without predicting how Arizona's highest court would decide the issue. *Finepoint Innovations, Inc. v. A.T. Cross Co.*, 2006 WL 3313688, *3 (D. Ariz. 2006).

On the merits, and acknowledging that "[t]he borders of the rule are hazy because courts are struggling to determine precisely which tort claims are barred," *Firetrace USA,*

1     800 F. Supp. 2d at 1050, the Court concludes it is likely the Arizona Supreme Court would

2     apply the ELR to bar BMO's claim in Count VI.  The conduct giving rise to Count VI is

3     the exact same conduct giving rise to BMO's contract claims in Counts IV and V—*i.e.*, the

4     improper solicitation of clients while using confidential information.  BMO articulates no

5     policy rationale why tort remedies should be available for the same conduct covered by the

6     relevant contracts.[4]

7            The reasoning of *Flagstaff Affordable Housing* supports this conclusion.  There, the

8     Arizona Supreme Court focused on the types of negotiations that gave rise to the formation

9     of the contract.  223 P.3d at 669.  Construction contracts "often are negotiated between the

10    parties on a project-specific basis and have detailed provisions allocating risks of loss and

11    specifying remedies."  *Id.*  Because the parties had ordered their affairs in this manner, the

12    Court concluded that "allowing tort claims pose[d] a greater danger of undermining the

13    policy concerns of contract law," namely "encourag[ing] parties to order their prospective

14    relationships."  *Id.*  The Court emphasized that "there are no strong policy reasons to

15    impose common law tort liability in addition to contractual remedies" when the pecuniary

16    losses "related to the building that is the subject of the parties' contract."  *Id.*

17           Here, the parties have similarly ordered their affairs in the employment context.

18    Defendants held high-level positions within BMO and were being compensated

19    accordingly.  In exchange for providing generous compensation and access to information,

20    BMO sought to protect itself from harm in the event of Defendants' departure.  The harm

21    was anticipated and described in detail in the various contracts—BMO feared, and sought

22    to protect itself against, the solicitation of its clients and the misuse of its confidential

23    information.  The alleged harm that now provides the basis for BMO's tortious inference

24    claim in Count VI is identical to the anticipated harm to BMO arising from Defendants'

25    alleged breach of those contracts.  Under these circumstances, BMO's appropriate remedy

---

26    [4]    To the extent BMO's argument is that, under *Firetrace USA*, the ELR can never
27    apply to tort claims outside the product liability and construction defect contexts (Doc. 21
      at 13), this argument lacks merit.  In opinions issued after *Firetrace USA* was decided,
      Arizona courts have clarified that the ELR may be applied outside those contexts.  *Cook v.*
28    *Orkin Exterminating Co.*, 258 P.3d 149, 152-54 & n.6 (Ariz. Ct. App. 2011) (applying ELR
      to negligence, misrepresentation, and fraud claims).

is in contract.  *Cf. QC Construction Prods.*, 423 F. Supp. 2d at 1015-16 ("[C]ount two of the complaint alleges that Cohill's interfered with QC's business relationships by representing that it was marketing QC's products to Arizona customers while it was actually marketing a competitor's product. . . .  This purely economic harm resulting from actions that were breaches of the parties' contract falls squarely under the economic loss rule.").

The Court acknowledges that there are reasons to be cautious about an overbroad application of the ELR.  In *KD & KD Enters. v. Touch Automation LLC*, 2006 WL 3808257 (D. Ariz. 2006), the court refused to apply the ELR to a fraudulent misrepresentation claim. It reasoned that the "key rationale underlying the economic loss doctrine presupposes that there has been a fair and equitable negotiation of the allocation of risk between the parties." *Id.* at *2.  The court explained that "[f]raudulent misrepresentation, however, undermines the ability of parties to negotiate freely, and therefore negates the presumption that an equitable negotiation has occurred.  It is unreasonable to restrict a party to contractual limitations of liability when fraudulent representations resulted in an unequal, unfair bargaining process.  In such a situation the traditional concern of tort law prevails— protecting society from an unreasonable risk of harm." *Id.*  The Court agrees with this analysis, but potential fraud related to the formation of the underlying contracts is not alleged here.

In sum, because the harm giving rise to BMO's claim in Count VI was expressly addressed by its employment agreements with Defendants, and there are no additional policy reasons that would necessitate tort liability, Count VI is barred under the ELR.  This conclusion makes it unnecessary to address Defendants' alternative argument that Count Six is preempted under AUTSA.

V.   Civil Conspiracy

In Count VII, BMO alleges that Defendants engaged in a civil conspiracy by using "BMO Confidential Information against BMO," coordinating their resignations, and soliciting "BMO clients in breach of Defendants' contractual agreements with BMO."

(Doc. 1 ¶¶ 138-39.)

Defendants argue that "[b]ecause BMO has failed to state a tort claim . . . its civil conspiracy claim likewise fails and must be dismissed." (Doc. 15 at 12.)  In response, BMO does not dispute that Count VII must be premised on a valid, underlying tort claim but contends that Count VII should survive dismissal because it "has pleaded the underlying tort to civil conspiracy through its claim for tortious interference." (Doc. 21 at 14 n.4.)

Because the Court has now dismissed the tortious interference claim in Count VI, it follows that the civil conspiracy claim in Count VII is also subject to dismissal.  As acknowledged by BMO, "[u]nder Arizona law, a claim of civil conspiracy must be based on an underlying tort." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011).  *See also Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 36 (Ariz. 2002).

VI.     Leave To Amend

Although BMO does not request leave to amend in the event of dismissal, the Ninth Circuit has suggested that, in certain circumstances, "a district court should grant leave to amend even if no request to amend the pleading was made." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (citation omitted).

Rule 15(a) of the Federal Rules of Civil Procedure "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).  "This policy is 'to be applied with extreme liberality.'" *Id.* (citation omitted).  Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

Here, although the Court is skeptical that BMO would be able to plead additional facts that could cure the deficiencies identified above, it will, in an abundance of caution, grant BMO leave to amend with respect to the dismissed claims in Counts III, VI, and VII.

1    Accordingly,

2    **IT IS ORDERED** that:

3    1.    Defendants' motion to dismiss (Doc. 15) is **granted in part and denied in

4    part**.  Counts III, VI, and VII are dismissed.

5    2.    BMO may file a First Amended Complaint ("FAC") within 21 days of the

6    issuance of this order, with the scope of amendment limited as discussed above.  If BMO

7    files a FAC, it shall, consistent with LRCiv 15.1(a), attach a redlined version of the

8    pleading as an exhibit.

9    Dated this 3rd day of October, 2022.

10

11

12    _____

13    Dominic W. Lanza
     United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28